EDGERTON v. THE STATE.

CRIMINAL LAW.—*Desecration of Sabbath.*—*Necessity a Question for the Jury.*—*Instruction.*—On the trial of a prosecution for desecrating the Sabbath by the performance of common labor, the question as to whether or not the performance of such labor on the Sabbath was a work of necessity is one of fact for the jury, and not one of law for the court.

SAME.—*Gathering Food for Live-Stock.*—The feeding of hogs on Sunday is a lawful work ; and if, according to the circumstances of the particular case, the usual and proper means to feed them, according to the practice of good husbandry, was to gather the necessary feed daily in the field, haul it to the feeding place, and there feed it to them, such work was not unlawful.

From the Henry Circuit Court.

*J. H. Mellette* and *E. H. Bundy*, for appellant.

*T. W. Woollen*, Attorney General, for the State.

BIDDLE, J.—Prosecution against the appellant for desecrating the Sabbath, commenced before a justice of the peace. Conviction before the justice, and appeal to the circuit court. Conviction in the circuit court, and appeal to this court.

Two questions are presented here :

1. Giving an alleged erroneous instruction to the jury by the court ;

2. The insufficiency of the evidence to support the ver-dict.

The charge is, that William Edgerton, on the 20th day of October, 1878, on the first day of the week, commonly

called Sunday, was found unlawfully at common labor, to wit, gathering and hauling corn, said William being at the time over the age of fourteen years, said common labor not being then and there a work of charity or necessity, etc.

The court instructed the jury at the trial as follows:

"No. 2. If the defendant was engaged at common labor, as charged in the affidavit, on Sunday, but, if such labor was a work of necessity, you will acquit the defendant. If, however, the labor performed could reasonably have been performed on Saturday, and the defendant, by his neglect, created the necessity for the work on Sunday, then he would not be excused; for the law requires that men should make all reasonable preparation for Sunday, so as to avoid the necessity of labor on that day. To create a legal necessity, the work must have been such as could not reasonably have been done on a previous week-day, or be reasonably postponed until a future day. If it was not proper for the defendant to feed his hogs on Saturday enough to last them over Sunday, but he could on Saturday have gathered, and placed at a convenient point, enough corn for their wants on Sunday, and thereby materially lessened the labor to be performed on Sunday, it was his duty to do so; and if he neglected such needful preparation, and gathered and hauled the corn on Sunday, the work of gathering and hauling the corn on Sunday would not be a work of necessity, although feeding it to his hogs would be."

We do not think this instruction is the true interpretation of the law. It directly states to the jury what labor would not be a work of necessity. This is a question of fact for the jury to decide, and not a question of law for the court to declare. Whether a work is a work of necessity or not, must necessarily depend upon the facts in each case. Sometimes a similar state of facts would be

a work of necessity, and sometimes not; the question, therefore, can not be reduced to a proposition of law which is uniform, and applicable to all cases alike.

The principle was properly expressed by Howk, J., in the case of *Wilkinson* v. *The State*, 59 Ind. 416, namely: "Labor performed on Sunday, which is necessary, under any particular state of circumstances, for the accomplishment of a lawful purpose, is not a violation of the Sunday law;" to which we may add in this case, that whenever labor is lawful and necessary to be done, then the usual and proper means by which it is done will also be necessary and lawful. It can not be doubted, as matter of fact, that to feed hogs on Sunday is a lawful and necessary work; now, if, according to the circumstances, the usual and proper means to feed them, according to the practice of good husbandry, was to gather the corn daily, and haul it to the pen and give it to the hogs, then gathering and hauling the corn and feeding the hogs on Sunday would not be unlawful; and whether such a method of feeding hogs on Sunday is a work of necessity or not, must, in each case, be left to the jury to decide as a question of fact.

The evidence in this case is substantially as follows:

Albert Greenstreet testified: "Live in Dunreith; know William Edgerton; saw him gathering corn on Sunday, in October; could not see how much corn he had; he had a one-horse wagon. The field is a mile north of Dunreith; his hogs were south of the depot in Dunreith. This was on the first day of the week, in Henry county, in October, 1878."

Seth Hays testified: "I know the defendant; saw him haul a load of corn through Dunreith, and throw a part of the corn to his hogs, and put the balance in the crib. This was on Sunday, October 20th, 1878. The bed had 12 or 15 bushels in it, ' scrip husked.' "

Orlando Hays testified: "Saw him hauling a load of corn through Dunreith; one-horse wagon; 10 to 15 bushels; on Sunday in October, 1878; at Henry county, Indiana."

William Patin testified: "Lived in Dunreith last Fall; saw the defendant with a load of corn, on Sunday, in Dunreith; he went on south; think there was 10 or 12 bushels in the wagon."

Joel Harrold testified: "Live in Dunreith; saw defendant hauling corn on the 20th of October, 1878; threw a part to his hogs, and put balance in crib."

Frederick Watkins testified: "When I saw him he was unloading a little corn; saw him throw a little in the crib; can't say how much."

Silhuese White testified: "Know William Edgerton; he is 45 or 50 years old."

William Edgerton testified: "My name is William Edgerton; am the defendant; on the morning of the 20th of October, I went with a part of a load of corn to Dunreith, that I had gathered the day before; I took the corn to my hog-pen below Dunreith, where I had a lot of hogs to feed; my wife rode down with me on the load of corn, from my house to Dunreith, where we were going to attend church and Sabbath-school; when we got to the church she got off and went in, and I threw the corn to my hogs and came back to the church and attended Sabbath-school; fed my hogs daily, and had fed them the day before; the corn was soft at the time, not fit for cribbing in any large quantity; the hogs had eat the corn off of the lot they were in, and after that I hauled corn to them; the hogs were out of corn and needed feeding; the gathering corn that Greenstreet says he saw was on the 13th of October, 1878; I was going to Sabbath-school, and only gathered enough for a lean feed for my hogs; the day before, and the

evening before, I had company, and took them to Raysville, and, while waiting there at Dunreith, I went down to the pens and saw the hogs were out of corn and were hungry, and I went Sunday morning and gathered a little jag, about four bushels, and took it down and fed them; on the evening of the 19th, I gathered corn and had it in the wagon, and on Sunday morning, on my way to church, took the corn down and fed my hogs; I had fed them on Saturday morning, the 12th of October, what I supposed would last them over Sunday, the 13th, but I found, as I have stated, that they were out on Saturday night, the 12th."

On cross-examination: "I did not feed them on Saturday enough to do over Sunday, because I thought they would do better to have it fresh on Sunday."

Mary Caad testified: "Resided with William Edgerton through October and November, 1878; saw him riding on the wagon that morning; he was going south; he was at Sabbath-school when I got there; I walked; his wife rode down in the wagon with him that morning."

We can not see any thing in this evidence out of the ordinary way of feeding hogs, in the fall of the year, before the corn is ripe enough to crib, as practised generally in the State of Indiana, by good husbandmen. The work of feeding the hogs on Sunday being lawful and necessary, the manner of feeding them—taking into view the time of year, the condition of the corn, the place where the corn was, and where the hogs were—also became lawful and necessary; and, the work thus being lawful and necessary, it was lawful and necessary to feed them on Sunday, in the same manner that would be usual and proper, according to the circumstances, to feed them on a week day.

The evidence is so clearly insufficient that we can not approve the verdict.

A work of necessity, within the meaning of the statute, does not mean a physical or absolute necessity; but a

Edgerton v. The State.

moral fitness or propriety in the work done, under the circumstances of each particular case, may be deemed a work of necessity, within the meaning of the law. Nor need the necessity be dangerous to life, health or property, which is beyond human foresight or control. On the contrary, the necessity may grow out of, or be incident to, a particular trade or calling, and yet be a work of necessity within the meaning of the act. It is not the design of the law to impose onerous restrictions upon, or add burdens to, any lawful trade or business. It has been held that keeping up a blast-furnace, running a mill, manufacturing gas, supplying water by water-works, furnishing milk by dairymen, gathering and boiling sugar-water, making malt beer, taking watermelons to market,—according to the circumstances of each case, are works of necessity within the meaning of the law; and we think that hauling the corn and feeding hogs on Sunday, under the circumstances of this case, fall within the same principle. See the case above cited; also *Morris* v. *The State*, 31 Ind. 189, and the cases there cited, and *Crocket* v. *The State*, 33 Ind. 416.

So strict a construction of the act as that held by the court below might authorize the arrest of superintendents, engineers, firemen, conductors and brakemen, while operating railroads, laborers in depots and stockyards herdsmen and feeders of cattle, " engaged in their usual avocations " on Sunday, and thus embarrass, if not entirely stop, the great commercial interests and leading industries of the State, a result certainly not intended by the Legislature that enacted the law.

The judgment is reversed, and the cause remanded, with instructions to sustain the motion for a new trial, and for further proceedings according to this opinion.